**Clara B. JOHNSON, Plaintiff,**

v.

**John J. CALLAHAN,[1] Ph.D., Acting Commissioner of Social Security, Defendant.**

**No. C 96–3070MWB.**

United States District Court, N.D. Iowa, Central Division.

April 29, 1997.

---

1. Pursuant to *Fed.R.Civ.P.* 25(d)(1), John J. Callahan is automatically substituted for the defendant Shirley S. Chater as Callahan is currently Acting Commissioner of Social Security.

Gregory W. Peterson, Elverson, Vasey & Peterson, L.L.P., Des Moines, IA, for Plaintiff.

Donna K. Webb, Sioux City, IA, United States Attorney's Office of the Northern District of Iowa, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING COMMISSIONER'S DENIAL OF SOCIAL SECURITY DISABILITY INSURANCE

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .............................................. 452
   A. Procedural Background ............................................ 452
   B. Factual Background ......................................... 452
      1. Introductory facts and daily activities ............................ 452
      2. Johnson's work and medical history .................................. 453
      3. Vocational expert's testimony ................................... 455
      4. The ALJ's conclusion ............................................. 456
   C. The Court's Jurisdictional Basis ....................................... 456

II. ANALYSIS ................................................ 457
   A. The "Substantial Evidence" Standard .................................. 457
   B. Relative Burdens of Proof ............................................ 458
   C. Review of the ALJ's Decision ......................................... 459
      1. Whether Johnson met the disability listings for active rheumatoid arthritis or arthritis of a major weight-bearing joint ................... 459
      2. Whether the ALJ posed an inaccurate and incomplete hypothetical question to the vocational expert ...................................... 461
      3. Whether the ALJ violated the Polaski standard ........................ 463

III. CONCLUSION ............................................. 464

This Social Security disability case requires the court to analyze an administrative law judge's decision to deny a plaintiff disability insurance benefits. At its core, this case is a question of to what extent the plaintiff's manipulation and stamina limitations affected her ability to perform work which existed in substantial numbers in the national economy. The plaintiff, however, raises three issues, any of which she argues, could serve as the basis for overturning the ALJ's decision to deny her benefits. To evaluate this case the court must address each of the plaintiff's issues. First, the plaintiff argues, she met the disability listings in §§ 1.02 and 1.03(A) of Appendix I to Subpart P of 20 C.F.R. Part 404 (1986) for

rheumatoid arthritis and arthritis of a major weight-bearing joint, respectively. Second, the plaintiff argues, the ALJ posed an inaccurate and incomplete hypothetical to the vocational expert that did not include her stamina and manipulation restrictions. Third, the plaintiff argues, the ALJ impermissibly discounted her subjective complaints of pain in violation of the Eighth Circuit's *Polaski* standard.

## I. INTRODUCTION

### A. Procedural Background

Clara B. Johnson filed for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et. seq.*, on March 5, 1987, alleging she had been disabled since August 1982. (Tr. 36–62.). Johnson was denied benefits initially, (Tr. 32–35.), and upon reconsideration. (Tr. 26–29.). Johnson did not appeal the denial of her 1987 application and did not take action for almost five years.

Johnson filed a second application for Title II disability benefits on May 11, 1992. (Tr. 47.). Johnson was denied benefits initially and upon reconsideration. (Tr. 45–46.). Johnson requested a hearing in front of an ALJ and after the hearing, on November 24, 1992, an ALJ issued an order denying benefits to Johnson finding she was not under a disability during the time when she met the earnings requirements. (Tr. 14–17.). Johnson filed a timely request for review (Tr. 7–10.), but on March 24, 1993, the Appeals Council affirmed the ALJ's decision denying benefits, holding Johnson's failure to appeal the denial of her initial application served as res judicata on her current application because her insured status had run on June 30, 1986. (Tr. 3–4.). Having exhausted her administrative remedies, Johnson filed for judicial review in federal district court on April 30, 1993. On July 19, 1995, district court Judge Donald E. O'Brien found Johnson did not receive adequate notice from the Social Security Administration regarding her appeal rights when it denied her initial 1987 application. (Tr. 201–14.). The court remanded the case with instructions that the Commissioner consider both Johnson's 1987

and 1992 applications. (Tr. 213.). On March 11, 1996, after a hearing, (Tr. 254–304.), ALJ John P. Johnson issued a decision finding Johnson was not disabled as defined by the Social Security Act prior to the expiration of her insured status on June 30, 1986. (Tr. 157–72.). On May 31, 1996, the Appeals Council declined to take jurisdiction of the case making ALJ Johnson's March 11, 1996, decision the Agency's final decision. It is now appropriate for this court to review plaintiff Johnson's application pursuant to 42 U.S.C. § 405(g) and determine if the Commissioner's decision was supported by substantial evidence on the record as a whole.

### B. Factual Background

#### 1. Introductory facts and daily activities [2]

The plaintiff in this case is Clara B. Johnson. Johnson graduated from high school in 1956. (Tr. 258.). In 1986, Johnson was married and living with her husband Marvin. (Tr. 277.). Johnson quit work in 1982 after she was diagnosed at the Mayo Clinic as having cancer of the larynx. (Tr. 264.). The subsequent surgery removed the cancer but left a hole in Johnson's larynx. (Tr. 265.). Since that time, in order to speak, Johnson has had to use a hand-operated device to cover the hole in her larynx. (Tr. 265.). After the operation, Johnson used her right hand to work the device, but when it became too weak to do the job, Johnson began using her left hand. (Tr. 265.). Johnson's hands were weak from arthritis. (Tr. 266.). In 1986, if her hands were bumped, they felt like they had been broken. (Tr. 266.). It was difficult to turn over pieces of paper and pull up the covers on the bed. (Tr. 266.). She could not do laundry. (Tr. 268.). On the other hand, Johnson could make toast and prepare cold cereal and juice. (Tr. 267.). Johnson could also make her bed poorly and wash dishes, although she could not put the dishes in the cupboard. (Tr. 267–68.). Johnson could dress herself, but could not button buttons. (Tr. 268.). Combing her hair was a terrible chore. (Tr. 268.). Johnson was un-

---

**2.** *Both parties agree Johnson's insured status ended on June 30, 1986, therefore, the testimony* of January 16, 1996, all pertained to Johnson's condition on or before June 30, 1986.

able to write out a check. (Tr. 270.). Johnson could only vacuum one room a day. (Tr. 268–69.).

Also in 1986, Johnson's ankles were constantly swollen and extremely painful. (Tr. 269–70.). She was unable to stand long enough to go grocery shopping. (Tr. 270–71.). Johnson was also unable to write letters or cards. (Tr. 271.). She even found it difficult to rip individual postage stamps apart from a book. (Tr. 271.). Johnson was also unable to lift her grandchild or change his diaper. (Tr. 272.). Johnson could not turn door knobs, or cut food, or plug in appliances, or open containers. (Tr. 274.). Johnson had been able to help her husband Marvin in his shop, but was no longer able to do so due to her pain. (Tr. 273.).

In 1982, Johnson's daughter was living with her. (Tr. 275.). She would help Johnson cook, clean, vacuum, and shop for groceries. (Tr. 275.). She also drove Johnson where she needed to go, did the yard work and completed any tasks Johnson started but was unable to finish. (Tr. 276–77.). Four months after her laryngectomy Johnson was able to drive a car again. (Tr. 276.). However, it was three or four months after her laryngectomy that Johnson's arthritis became much worse than it had ever been. (Tr. 283.). Johnson would take sixteen aspirin a day to fight her arthritis pain. (Tr. 273, 284.). The aspirin was actually Ecotrin, a coated aspirin. (Tr. 284.). At that time, Johnson could walk a block and a half a day. (Tr. 286.). Standing in one place hurt more than walking. (Tr. 286.). Even so, Johnson could only stand for a couple of minutes. (Tr. 287.). She was also unable to stoop or squat without the aide of a crutch. (Tr. 287.). Johnson had trouble gripping things. (Tr. 287.). Sitting for more than one half hour caused Johnson to ache all over. (Tr. 288.). She could not climb stairs. (Tr. 289.). Cold weather and smoky or dusty air bothered Johnson after the laryngectomy. (Tr. 290–91.).

Marvin Johnson, Clara's husband, also testified at the hearing. (Tr. 291–94.). Marvin Johnson testified Clara's problems with arthritis pain began in 1982. (Tr. 292.). At that time she could not pull on her shoes or stockings, lift a skillet, or fill a coffee pot with water. (Tr. 292.).

### 2. Johnson's work and medical history

Johnson worked as a nurse's aide for four years from 1978 to 1982, and performed such duties as bathing, feeding and dressing patients. (Tr. 56, 258.). She also had to lift patients. (Tr. 278–79.). She did not take any medical records and did not help with any medical procedures. (Tr. 258.). Prior to working as a nurse's aide, Johnson helped clean the Aztec Restaurant and Lounge in Cedar Rapids for three years in 1976–78. (Tr. 56, 258–59, 280–81.). Johnson's duties were "self-explanatory," but it should be noted a normal shift was four to four and one-half hours during which time Johnson was always on her feet. (Tr. 259.). Johnson also had to do such heavy work as move tables, stack chairs, push a vacuum cleaner and scrub floors. (Tr. 259.). Johnson also worked part time in a gift shop in Cedar Rapids (Shirbroun's Gift Center) for somewhat less than a year in parts of 1973 and 1974. (Tr. 56, 260–61.). In that job Johnson waited on customers, wrapped gifts, and operated a cash register. (Tr. 262.). She was also required to stand all day. (Tr. 262.).

On June 1, 1982, Johnson had a laryngectomy at the Mayo Clinic in Rochester, Minnesota. (Tr. 96.). Records from Dr. K. Olsen at the Mayo Clinic showed Johnson was "doing well" from August 29, 1982, through October 10, 1985, in recovering from the surgery and not having the cancer recur. (Tr. 84.). On May 9, 1983, Dr. DePompolo wrote Johnson "does all of her own housework and does not have any problems." (Tr. 86.). He also noted she had "a tender, swollen ankle, but is otherwise without pain." (Tr. 86.). She also had "slight AM stiffness in digits, wrists." (Tr. 86.). On December 16, 1982, Dr. Cockerill wrote Johnson had what appeared to be the "early manifestations of rheumatoid arthritis." (Tr. 105.). On February 14, 1983, Dr. Clement Michet wrote, "Active seropositive RA. Negative FH. Small nodule. No other extra articular manipulations. 3–4 hours of morning stiffness." (Tr. 85.). On March 18, 1983, Dr. Michet wrote, "[I]t appears that you have

active progressive rheumatoid arthritis." (Tr. 109.). On June 21, 1984, Dr. Michet wrote a letter to Dr. Nathan Josephson of Des Moines transferring his patient (Johnson) to Dr. Josephson because Johnson lived closer to Des Moines than she did to Rochester. (Tr. 110.). In his letter, Dr. Michet reported this about Johnson:

> I saw her only once in February, 1983 ... [a]t that time she reported several months of increasingly severe polyarthralgias and polyarthritis with associated morning stiffness and fatigue. On examination she had bilateral small olecranon nodules as well as synovitis of the PIP joints, MCP joints, wrists, knees, ankles and MTP joints.... Hand and wrist x-rays which had been performed in December, 1982, revealed degenerative cysts in the lunate bones bilaterally and in the left navicular bone.

(Tr. 110.). On July 10, 1984, Dr. Josephson reported,

> Standing knees: An AP upright film of the knees was made as requested. There is considerable arthritic narrowing of the left knee joint medially with demineralization and loss of cortical detail laterally as well. No soft tissue calcification or mass is identified on the AP film but on the lateral film, there appears to be fluid or swelling of the supratellar bursa. The right knee appears relatively normal. (W)

(Tr. 112.).[3] On March 31, 1987, Dr. Eric Paulson wrote Johnson has "a.m. stiffness of approximately 1–1.5 hours." (Tr. 113.). He also wrote she could only do housework in a single room each day, and if she tried to do more, she "ends up with acute inflammation and problems the subsequent day preventing her from doing even the routine of making her bed and meals." (Tr. 113.). Dr. Paulson also wrote that Johnson's worst joint was her left ankle. (Tr. 113.). Johnson also described situations where she felt like the world was crowding in on her, which Dr. Paulson described as "panic attacks." (Tr.

114.). Finally, Dr. Paulson described Johnson's joints as such,

> Full ROM to the shoulders, left elbow. Right elbow had extension to 160 degrees. There were no rheumatoid nodules. Wrists evidence 1 + synovial thickening bilaterally with slight decreased ROM, but generally good. Fist in extension was full with the exception of the right index finger having approximately 95% fist. There was some mild synovial thickening of the left second and fifth PIP and right second and third PIP. There is kyphosis to the thoracic spine. ROM to the knees was full with crepitus on ROM on the left, no fluid noted. ROM to the hips was full. Ankle ROM full. No significant synovial thickening. She did have some mild enlargement of the MTP of the great toe bilaterally, but no acute inflammation. Generally, no significant ongoing synovial thickening of the MCP's of either hand or her other joints.

(Tr. 114.).

On June 9, 1987, Dr. William Minks prepared a residual functional capacity report of Johnson. (Tr. 120–22.). He found Johnson could lift a maximum of 20 pounds and could frequently lift 10 pounds. (Tr. 120.). He also found Johnson could stand or walk, or she could sit for six hours in an eight-hour day. (Tr. 120.). On August 10, 1987, Dr. Everson prepared a residual functional capacity report of Johnson. (Tr. 124–26.). He found the same restrictions as did Dr. Minks, except Dr. Everson also found Johnson's speaking ability was limited. (Tr. 124.). Dr. Everson also said Johnson's rheumatoid arthritis was "under fairly good control." (Tr. 125.).

In addition to the medical records already discussed, there are many more records from 1992 and beyond which describe Johnson's hip replacement and other physical ailments she has endured. These records tend to prove Johnson is disabled today. Both parties agree, however, Johnson's insured status ended on June 30, 1986, and only those documents which shed light on whether or not

---

**3.** Dr. John Walker's name also appears on this report, and it appears to the court that Dr. Josephson's name is listed because he was the patient's doctor of record, not because he was the doctor who examined Johnson. However, as both parties seem to assume it was Dr. Josephson who conducted the July 10, 1984, investigation, the court will assume the same.

Johnson was disabled prior to that date are relevant to this inquiry. After carefully reviewing all the medical records included in the transcript, the court is convinced it has discussed almost all of the records which are germane to this case. The court will discuss additional post-insured status medical records later in this ruling only as they become necessary to resolve this matter.

### 3. Vocational Expert's Testimony

Vocational expert Carma Mitchell testified at the hearing. (Tr. 295–303.). First the expert presented her credentials to the ALJ. (Tr. 295.). Then, Mitchell indicated she had been present during the hearing and had reviewed the exhibits in the case. (Tr. 295.). Next, Mitchell explained how she had prepared a chart describing Johnson's past work activity. (Tr. 297.). Next, Mitchell explained how she makes use of the Dictionary of Occupational Titles (DOT) and other written materials in her job. (Tr. 296–97.). In his first hypothetical, the ALJ asked Mitchell if the person he described would be able to return to their past work. The ALJ's hypothetical provided:

My first assumption is that we have an individual who is 47 years old as of the date last insured for Title II benefits, and 43 years old as of the alleged date of disability. She is a female, with a high school education, plus additional training as a certified nurse's aide. She has past relevant work as you've indicated in Exhibit number 46. And she has the following impairments. She had progressive rheumatoid arthritis affecting various joints, with complaints of pain. And she was status post subtotal laryngectomy for cancer of the larynx, and as a result of a combination of those impairments, she had the physical and mental capacity to perform work-related activities except for lifting of no more than twenty pounds, routinely lifting ten pounds, with no standing or walking for more than two of eight hours, with no repetitive bending, stooping, squatting, kneeling, crawling, or climbing; no repetitive pushing or pulling; no repetitive gripping, but gross and fine manipulation was intact. This individual would not work in the presence of excessive heat

or cold or more than moderate levels of dust, fumes, or smoke. And she should perform no work which required continuous, clear oral communication. Would this individual have been able to perform any jobs she previously worked at, either as she performed it or as it is generally performed within the national economy? And if so, would you please specify which job?

(Tr. 298.). The vocational expert testified the hypothetical person described in the question could not return to her past relevant work. (Tr. 299.). The vocational expert also testified that if the hypothetical person could communicate with the public on a limited basis, there would be some jobs in the national economy that she would be capable of performing. (Tr. 300.). Those jobs included a surveillance monitor, an office helper, or a document preparer. (Tr. 300–01.).

In his second hypothetical, the ALJ asked Mitchell if the person he described would be able to return to her past work. The second hypothetical described "an individual with the same age and sex and education, past relevant work impairments as previously specified." (Tr. 301.). It also provided:

And this would be an individual who would have the physical and mental capacity to perform work-related activities, except for lifting of no more than five pounds, with no standing of more than a few minutes at a time; no sitting of more than one-half to one hour at a time, and no walking of more than one to one and a half blocks, with no repetitive bending, stooping, squatting, or climbing; no pushing or pulling; no repetitive gripping, gross or fine manipulation of handling. And by handling, I mean using the wrist to twist or turn objects. No repetitive work with the arms overhead. This individual should avoid excessive heat or cold, and should not work in the presence of more than minimal amounts of dust, fumes, or smoke, and should perform no work which requires continuous clear oral communication.

(Tr. 301–02.). The vocational expert testified that this hypothetical person could not return to her past relevant work, nor could she

perform any unskilled job. (Tr. 302.). The vocational expert also testified that, if the restriction that the hypothetical person could not complete an eight-hour work day without successive breaks and could not complete tasks timely was added, it would further insure that the hypothetical person could not work. (Tr. 303.).

### 4. The ALJ's conclusion

The ALJ reviewed the record and found, "during the pertinent time period, the claimant had progressive rheumatoid arthritis affecting various joints with complaints of pain and was status post subtotal laryngectomy for cancer of the larynx." (Tr. 161.). But the ALJ found none of Johnson's impairments met any of the Listings of Impairments in the Code of Federal Regulations. (Tr. 162.). Specifically, he found a "lack of medical evidence of persistent joint pain, swelling, and tenderness involving multiple major joints and with signs of joint inflammation on physical examination despite prescribed therapy for at least twelve months." (Tr. 161.). The ALJ did find that Johnson had trouble with a number of her joints from 1982 through 1986, but he also found that no individual joint gave Johnson problems for more than twelve months. (Tr. 162.). The ALJ made particular note of, "the long periods of time during the pertinent time period in which the claimant was not being seen for complaints of, evaluation of, and treatment for her rheumatoid arthritic complaints." (Tr. 162.). Having concluded that Johnson did not meet any of the disability listings, the ALJ reviewed the evidence to determine whether, during the pertinent time, Johnson had the residual functional capacity to perform work which exists in significant numbers in the national economy. (Tr. 161.). He concluded she did. (Tr. 161.). Because the ALJ believed Johnson could perform work which exists in significant numbers in the national economy, he concluded Johnson was not disabled within the meaning of the Social Security Act. (Tr. 171.). The court will next review its jurisdictional basis for adjudicating this case, and then proceed to analyze the ALJ's decision in light of the record as a whole and the prevailing case law in the Eighth Circuit.

### C. The Court's Jurisdictional Basis

In *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered de novo by the state agency. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. (1986). Third, the claimant may seek review by the Appeals Council. 20 C.F.R. §§ 404.967 et seq., 416.1467 et seq. (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert,* 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides, "The final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title.... " In pertinent part, 42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States

District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

42 U.S.C. § 405(g) (Supp.1995). The gist of the preceding analysis is that the court may affirm, reverse or remand the ALJ's decision.

## II. ANALYSIS

### A. The "Substantial Evidence" Standard

The Eighth Circuit's standard of review in Social Security cases is abundantly documented and oft repeated. If supported by substantial evidence in the record as a whole, the Secretary's findings are conclusive and must be affirmed. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996); *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); 42 U.S.C. § 405(g) (Supp.1995)). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996) (quoting *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir.1993)). Or, in the words of the Supreme Court, substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427, 28 L.Ed.2d at 842 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ The Eighth Circuit has taken pains to emphasize that, "A notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989) (citing *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir.1989)). Substantial evidence on the record as a whole requires the court to "take into account whatever in the record fairly detracts from [the] weight" of the administrative decision, consider the weight of the evidence in the record, and "apply a balancing test to evidence which is contradictory." *Id.* Put simply, in reviewing the decision below, the court must "encompass[ ] evidence that detracts from the decision as well as evidence that supports it." *Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir.1996) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir.1996)). The court, however, does "'not reweigh the evidence or review the factual record de novo.'" *Roe*, 92 F.3d at 675 (quoting *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir.1994)). Likewise, it is not the court's task to review the evidence and make an independent decision. *Ostronski v. Chater*, 94 F.3d 413 (8th Cir.1996) (citing *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir.1996)). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the denial of benefits. *Id.* In other words, this court "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993)). Even in the case where this court "might have weighed the evidence differently, [it] may not reverse the Commissioner's decision when there is enough evidence in the record to support either outcome." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992)).

■ Lest one be misled into believing the process is stacked in the Commissioner's favor, bear in mind that, "The standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." *Cooper v. Secretary*, 919 F.2d 1317, 1320 (8th Cir.1990) (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989)). In cases where the Commissioner's position is not supported by substantial evidence in the record as a whole, the court must reverse, *see Lannie v. Shalala*, 51 F.3d 160, 164 (8th Cir.1995). In those cases where a full and fair record does not exist, the court must

remand to the Commissioner. *See Highfill v. Bowen,* 832 F.2d 112, 115 (8th Cir.1987) (citing *Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir.1984) and *Dorsey v. Heckler,* 702 F.2d 597, 605 (5th Cir.1983)). Remand is not appropriate, however, if it would merely delay benefits. *Andler,* 100 F.3d at 1394 (citing *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984)).

■ It is also important to consider the ALJ's " 'duty to fully and fairly develop the record even if ... the claimant is represented by counsel.' " *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994) (quoting *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992)). This duty exists to insure " 'a just determination of disability.... Claimants, especially those not represented by counsel, can hardly be expected to be familiar with the intricacies of the Secretary's Guidelines.' " *Clark v. Shalala,* 28 F.3d 828, 830 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). " '[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice.' " *Battles v. Shalala,* 36 F.3d at 44 (quoting *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988)).

### B.  Relative Burdens of Proof

To be awarded disability benefits, a person must be legally disabled.

> The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months....

42 U.S.C. § 423(d)(1)(A) (1994).

An impairment will only be considered of such severity if the individual is "not only unable to do his previous work but cannot, considering ... [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2) (1994). To simplify

these definitions, Code drafters developed a sequential evaluation process to analyze disability claims:

(1) Is the claimant currently engaged in substantial gainful activity? If "Yes," the claim is denied. If "No," go to Step 2.

(2) Is the claimant's medical impairment or combination of impairments severe enough that it significantly limits physical or mental ability to do basic work activities? If "Yes," go to Step 3. If "No," the claim is denied.

(3) Does the claimant have an impairment or combination of impairments which meets or equals the duration requirement and is contained in the listing of impairments? If "Yes," the claim is approved. If "No," go to Step 4.

(4) Does the claimant have an impairment or combination of impairments which prevents past relevant work? If "Yes," go to Step 5. If "No," the claim is denied.

(5) Can the claimant, given his residual functional capacity and his age, education and past work experience perform any other work which exists in substantial numbers in the national economy? If "Yes," the claim is denied. If "No," the claim is approved.

*See* 20 C.F.R. § 404.1520(a)–(f)(1) (1994); *Williams v. Sullivan,* 960 F.2d 86, 88 (8th Cir.1992).

The claimant bears the burden of making a *prima facie* case of disability, which includes proof of no substantial gainful activity under Step 1 and proof of severity under Step 2. *See* 20 C.F.R. § 404.1512(c) (1994); *Williams,* 960 F.2d at 88. At Step 3, it is the job of a medical or psychological consultant employed by the Social Security Administration to determine whether a claimant's impairments meet or equal a listing. 20 C.F.R. § 404.1526(b) (1994), *see also Cruze v. Chater,* 85 F.3d 1320, 1322 (8th Cir.1996). At Step 4, the claimant has the burden of proving that he cannot return to his past relevant work. *See Baumgarten v. Chater,* 75 F.3d 366, 368 (8th Cir.1996) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)). If the

claimant meets his burden of proof at Step 4, the burden shifts to the Commissioner to establish the claimant's ability to perform other work in Step 5. *Id.*

### C. Review of the ALJ's Decision

In her brief, Johnson raises three issues, any of which she argues, could serve as the basis for overturning the ALJ's decision to deny her benefits. Specifically, Johnson argues (1) during the pertinent time she met the disability listings contained in §§ 1.02 and 1.03(A) of Appendix I to Subpart P[4] Plaintiff's Exhibit 1, p. 88. of 20 C.F.R. Part 404 (1986) for active rheumatoid arthritis and other inflammatory arthritis, and arthritis of a major weight-bearing joint (due to any cause), respectively; (2) the ALJ posed an inaccurate and incomplete hypothetical to the vocational expert; and (3) the ALJ impermissibly discounted Johnson's credibility in violation of *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984) (*supplemented*, 751 F.2d 943 (8th Cir.1984), *vacated*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand*, 804 F.2d 456 (8th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). The court will address each of the plaintiff's arguments in turn.

### 1. Whether Johnson met the disability listings for active rheumatoid arthritis or arthritis of a major weight-bearing joint

Johnson supports her argument that, during the pertinent time period, she met the disability listings contained in §§ 1.02 and 1.03(A) of Appendix I to Subpart P of 20 C.F.R. Part 404 (1986) for active rheumatoid arthritis and other inflammatory arthritis, and arthritis of a major weight-bearing joint

4. The plaintiff's brief refers to the nonexistent Subpart B; the court assumes the plaintiff intended to refer to Subpart P.

5. Section 1.02 requires, *inter alia*, that a claimant have,

    History of persistent joint pain, swelling, and tenderness involving multiple major joints and with sign soft joint inflammation (swelling and tenderness) on current physical examination despite prescribed therapy for 3 months, resulting in significant restriction of function of the affected joints, and clinical activity expected to last at least 12 months.

(due to any cause), respectively, by citing the handwritten answers her treating physician, Dr. Nathan Josephson, gave to certain interrogatories posed to him. The interrogatories asked Dr. Josephson if he had examined Johnson's medical records and if he felt he had sufficient information to comment knowledgeably about Johnson's condition prior to June 30, 1986, when her insured status ended. (Tr. 247.). Dr. Josephson answered, "Yes," to both of these questions. (Tr. 247.). Dr. Josephson also answered, "Yes," to a question that asked if Johnson had active rheumatoid arthritis prior to June 30, 1986. (Tr. 247.). In response to a question that asked if Johnson met the disability requirements for active rheumatoid arthritis contained in § 1.02,[5] he wrote, "Unequivocally!" He also wrote that the diagnosis for active rheumatoid arthritis was made in February 1983 and corroborated in July 1984. In response to a question that asked if Johnson met the disability requirements for arthritis of a major weight-bearing joint contained in § 1.03,[6] Dr. Josephson wrote, "Absolutely! Pt had obvious anatomical deformity left knee 1984—marked synontis, flexion contracture 25° and clear Xray evidence of significant joint space narrowing. This disease process and joint damage resulted in marked limitation in ability to walk and stand as of July 1984." He also wrote that the diagnosis for active rheumatoid arthritis was made in July 1984.

In addition, in a letter that accompanied his answers to the interrogatories, Dr. Josephson wrote:

    [A]s of July 10, 1984, Mrs. Johnson had a classical diagnosis of rheumatoid arthritis:

§ 1.02(A) of Appendix I to Subpart P of 20 C.F.R. Part 404 (1986).

6. Section 1.03 requires, *inter alia*, that a claimant have,

    Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk or stand. § 1.03(A) of Appendix I to Subpart P of 20 C.F.R. Part 404 (1986).

(1) signs of joint inflammation on physical exam despite prescribed therapy for at least three months resulting in significant restriction of function of the affected joints and clinical activity expected to last 12 months and (2) corroboration of diagnosis by (a) strongly positive rheumatoid factor at a titer of 1:2560 and (b) x-ray evidence of progressive joint destruction (left knee). (Tr. 246.).

In response to Johnson's argument that she was disabled as per § 1.02, the Government argues the transcript reflects that Dr. Josephson only observed Johnson once while she was insured and, in that report, Dr. Josephson did not find Johnson had problems with *multiple* major joints. (Tr. 112.).[7]

In response to Johnson's argument that she was disabled as per § 1.03, the Government argues that Dr. Josephson's one pre–1986 report exam of Johnson did not observe that her ability to walk or stand was markedly limited. (Tr. 112.). The Government also cites reports from Dr. Fellows,[8] which indicated Johnson did not yet have a severe change in either knee, (Tr. 130.), and from Dr. Paulson which indicated a full range of motion in both knees. (Tr. 114.). The Government also argues that Dr. Josephson was not Johnson's treating physician while she was still insured because Dr. Josephson only saw Johnson once during that time.

The Eighth Circuit has "on repeated occasions emphasized that the treating physician's evidence must be given great weight, with deference to the physician's findings over an examining physician or consultant." *Morse v. Shalala,* 16 F.3d 865, 872 (8th Cir. 1994) (citing *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992); *Henderson v. Sullivan,* 930 F.2d 19, 21 (8th Cir.1991); *Hancock v. Secretary of the Dep't of Health, Educ. and Welfare,* 603 F.2d 739, 740 (8th Cir. 1979)). This is because, "The treating physician has the best opportunity to observe and evaluate a claimant's condition." *Id.* This approach is also consistent with Social Security regulations which grant a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case. *See* 20 C.F.R. § 416.927(d)(2) (1986).

This is not to say a treating physician's opinion is unassailable. As the Eighth Circuit recently explained, "Although the opinion of a treating physician is entitled to great weight, such an opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data." *Wilson v. Chater,* 76 F.3d 238, 241 (8th Cir.1996). *See also Cruze,* 85 F.3d at 1324 (A treating physician's opinion "does not automatically control, since the record must be evaluated as a whole.") (quoting *Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir.1995)). Moreover, "[W]hen the [treating] physician's opinion amounts only to a conclusory statement, it is not entitled to greater weight than any other physician's opinion." *Metz v. Shalala,* 49 F.3d 374, 377 (8th Cir.1995) (citing *Thomas,* 928 F.2d at 259).

■ After reviewing the facts and law presented above, the court is compelled to conclude of Dr. Josephson's opinion that, during 1984, Johnson met the disability listings in §§ 1.02 and 1.03 is not entitled to substantial weight. The court is aware that its decision is an exception to the general rule that a treating physician's opinion is entitled to great weight, but it believes that the evidence of the record as a whole merits its conclusion that this is the exceptional case. With respect to § 1.02, as the Government pointed out, Dr. Josephson observed Johnson only once during her insured period and the only major joint with which he noted problems was Johnson's left knee. It is entirely possible, of course, that Dr. Josephson no-

---

7. The record to which the Government refers is the one which the court is assuming was written by Dr. Josephson. Obviously, if this record was written by Dr. Walker, the Government's case would be that much stronger because, in that case, the transcript would not contain any pre–1986 records from Dr. Josephson.

8. Dr. Fellows wrote his report on January 21, 1992, and it indicated "mild rheumatoid changes in the right knee with more narrowing laterally. The left knee shows moderately severe changes with complete loss of the joint space medially with bone on bone contact and moderately severe changes laterally." (Tr. 130.).

ticed other major joints with which Johnson was having problems but did not make note of them in his records. It is difficult to imagine a reason why a conscientious doctor would omit such observations from his notes. It is easier to imagine, twelve years after the fact, when his memory faded but the light of hindsight provides stark illumination of the extent to which his patient's health has deteriorated, a doctor would be motivated by compassion to testify in a manner which would provide his patient a minimal level of economic security. The court cannot say for sure which scenario, if either, best describes Dr. Josephson's testimony. The court can say, however, that there is not substantial evidence on the record as a whole to say that the ALJ erred when he chose to discount Dr. Josephson's testimony as it applied to § 1.02.

With respect to § 1.03, Johnson's argument suffers for reasons similar to those that made his § 1.02 argument weak, i.e., Dr. Josephson's one medical report from the time when Johnson was still insured did not observe that Johnson suffered from all the symptoms required to prove she met that particular disability listing. Specifically, Dr. Josephson's report did not note that Johnson's ability to walk or stand was markedly limited. Again, it may be that, for some unknown reason, Dr. Josephson simply omitted this important observation from his notes. The more likely explanation, however, is that his testimony was motivated by compassion for his patient. For this reason, the court cannot find there was substantial evidence on the record as a whole to say that the ALJ erred when he chose to discount Dr. Josephson's testimony as it applied to § 1.03. Moreover, Johnson's § 1.03 argument is even weaker than her § 1.02 argument, because there are other doctors' reports in the transcript which indicate that, as late as 1992, Johnson's ability to walk was not markedly limited.

### 2. Whether the ALJ posed an inaccurate and incomplete hypothetical question to the vocational expert

Johnson's second claim is that the hypothetical question the ALJ posed to the vocational expert during the administrative hearing was inaccurate and incomplete. As mentioned above, the ALJ's first hypothetical provided:

My first assumption is that we have an individual who is 47 years old as of the date last insured for Title II benefits, and 43 years old as of the alleged date of disability. She is a female, with a high school education, plus additional training as a certified nurse aide. She has past relevant work as you've indicated in Exhibit number 46. And she has the following impairments. She had progressive rheumatoid arthritis affecting various joints, with complaints of pain. And she was status post subtotal laryngectomy for cancer of the larynx, and as a result of a combination of those impairments, she had the physical and mental capacity to perform work-related activities except for lifting of no more than twenty pounds, routinely lifting ten pounds, with no standing or walking for more than two of eight hours, with no repetitive bending, stooping, squatting, kneeling, crawling, or climbing; no repetitive pushing or pulling; no repetitive gripping, but gross and fine manipulation was intact. This individual would not work in the presence of excessive heat or cold or more than moderate levels of dust, fumes, or smoke. And she should perform no work which required continuous, clear oral communication. Would this individual have been able to perform any jobs she previously worked at, either as she performed it or as it is generally performed within the national economy? And if so, would you please specify which job?

(Tr. 298.). The ALJ's second hypothetical contemplated most of Johnson's self-imposed restrictions in addition to the restrictions included in the ALJ's first hypothetical. The vocational expert testified that the second hypothetical person could not perform work which existed in significant numbers in the national economy. The ALJ found the limitations in the second hypothetical were not supported by the medical evidence and, therefore, did not use the vocational expert's response to that question in determining whether Johnson was disabled. (Tr. 169.).

Johnson objects to the ALJ's decision to use only the first hypothetical because it did not include limitations on her stamina, endurance, rate of speed and attendance. Johnson also argues the hypothetical should have included limitations on her dexterity and fine manipulation skills. The Government's response to this argument is that the ALJ need only accept those limitations which he finds credible, and there is substantial evidence in the record as a whole to support the ALJ's finding that Johnson's requested limitations were not supported by the medical evidence.

To support her argument that the hypothetical should have included additional restrictions, Johnson relies heavily on a report from Dr. Paulson written on March 3, 1987, which provides:

> [S]he does have pain at rest, but it is worse when she 'overdoes things.' Her ability to do work is quite variable from day to day but as a general rule she limits her housework to a single room at a time .... If she tries to do more than that in any given day, she ends up having acute inflammation and problems the subsequent day preventing her from doing even the routine of making her bed and meals.

(Tr. 113.). The problem with relying on this record from Johnson's perspective is that it was produced nine months after her insured status expired. While not necessarily without value, Dr. Paulson's report is relevant only to the extent that it sheds light on Johnson's condition prior to July 1, 1986.

Johnson also relies on the testimony from her most recent administrative hearing where she discussed the effects of her various physical afflictions on her ability to work prior to 1986. At the hearing, Johnson testified her hands were so sore it was difficult to turn over pieces of paper and pull up the covers on the bed. (Tr. 266.). She could perform some routine personal hygiene and household chores, but arthritic pain prevented her from doing others. (Tr. 267–268.). She also testified her ankles were constantly swollen and extremely painful, she could only stand for short periods of time, and she could not write letters. (Tr. 269–70.). She was also taking sixteen aspirins per day. (Tr. 273, 284.). Johnson's daughter corroborated her testimony, (Tr. 275–77.), as did Johnson's husband, Marvin. (Tr. 291–94.).

The Eighth Circuit has discussed the use of hypothetical questions in Social Security cases extensively. The Circuit has held that, "The point of the hypothetical question is to clearly present to the VE [vocational expert] a set of limitations that mirror those of the claimant." *Roe*, 92 F.3d at 676 (citing *Hogg v. Shalala*, 45 F.3d 276, 279 (8th Cir.1995)). Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. *Pickney*, 96 F.3d at 296 (citing *Cruze*, 85 F.3d at 1323). When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. *Id.* (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir.1994)). This is because, "A vocational expert cannot be assumed to remember all of a claimant's impairments from the record." *Newton v. Chater*, 92 F.3d 688, 694 (8th Cir.1996) (citing *Whitmore v. Bowen*, 785 F.2d 262, 263–64 (8th Cir.1986)). "For this reason, [T]he ALJ must set forth all of the claimant's disabilities when posing a hypothetical question to the VE." *Ostronski*, 94 F.3d at 420 (citing *Greene v. Sullivan*, 923 F.2d 99, 101 (8th Cir.1991)). However, "all" of the claimant's disabilities " 'include only those impairments that the ALJ finds are substantially supported by the record as a whole.' " *Roe*, 92 F.3d at 675 (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir.1993)). That is to say, "[T]he hypothetical is sufficient if it sets forth the impairments that *the ALJ* has found the claimant to have." *Ostronski*, 94 F.3d at 420 (emphasis added) (citing *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir.1991)). Along those lines, "[T]he ALJ need not include every physiological impairment suggested by the evidence." *Id.* (citing *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir.1985)). On the other hand, "[A] hypothetical question based solely upon the ALJ's assumptions, without medical corroboration, is devoid of usefulness or meaning." *Morse*, 16 F.3d at 874 (citing *Mitchell v. Sullivan*, 925 F.2d 247, 249–50 (8th Cir. 1991)). Even so, if the ALJ's hypothetical is

different, but not materially different from the restrictions described by the doctor, there is no error. *See Miller v. Shalala,* 8 F.3d 611, 614 (8th Cir.1993). Also, a hypothetical need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments. *Roe,* 92 F.3d at 676.

▮ After reviewing the transcript, the court concludes the restrictions on manipulation and stamina Johnson now requests are interrelated and the substantial evidence on the record as a whole did not support the ALJ's decision to exclude those restrictions from his hypothetical. On February 14, 1983, Dr. Michet wrote Johnson suffered from, "3–4 hours of morning stiffness." (Tr. 85.). On March 31, 1987, Dr. Eric Paulson wrote Johnson has "a.m. stiffness of approximately 1–1.5 hours." It is apparent from these records that Johnson had significantly more trouble "warming up" than the average person. Significantly, unlike a case of sore muscles which might benefit from being worked and stretched, Johnson's medical records indicate that the more activity in which she engaged, the worse her pain became. *See* Report of Dr. Paulson (Tr. 113.). Because Johnson was not working at the time these reports were made, the only logical assumption can be that, had she been working, Johnson's arthritic pain and problems would have been even worse. By not working Johnson was able to ration her small reserve of energy throughout the day and successfully fill the role of semi-sedentary homemaker. Had she tried to work a job for eight hours a day, five days a week, in the competitive economy, it is hard to imagine a result other than utter failure. For this reason, the court concludes that, had the ALJ posed a proper hypothetical question, the vocational expert would have concluded Johnson was not capable of performing work which exists in the competitive economy. This is, in fact, what the vocational expert

concluded in response to the second hypothetical which contained most of the restrictions this court believes was required by the evidence.

▮ Moreover, although neither Johnson nor the Government mentions it, the court also finds it of some consequence that Johnson was reporting incidents of panic attacks to Dr. Paulson shortly after her insured status ran. (Tr. 114.). If one can infer from this report that Johnson had at least some psychological problems while she was still insured (and the court believes this to be a logical inference), this condition should also have been factored into a proper hypothetical.[9] After taking this additional restriction into consideration, in order to find that Johnson was not disabled, not only would this court have to conclude that a person who had recently had her larynx removed and could only speak by squeezing her arthritic hand to manipulate a device in her throat, and who needed a few hours each morning to "warm up," and who needed to take sixteen aspirin each day to subdue her pain, was capable of working, it would also have to conclude that, if this person with these limitations also suffered from a fragile psychological condition, the increased emotional and physical stress from her job would not be enough to prevent her from working. The court is not prepared to reach such a conclusion.

### 3. Whether the ALJ violated the Polaski standard

Finally, Johnson argues the ALJ violated the Eighth Circuit's well-established *Polaski* standard for evaluating the credibility of a witness. The seminal case for evaluating a claimant's subjective complaints of pain in Social Security cases is *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984) *(supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96

9. Johnson's psychological health was not mentioned during the hearing. To some extent the fault for this lies with Johnson's representative at the hearing. To some other extent the fault lies with the ALJ. *See Battles,* 36 F.3d at 44 (ALJ has a "duty to fully and fairly develop the record even if ... the claimant is represented by counsel."); *Clark,* 28 F.3d at 830 (Duty exists to insure "a just determination of disability .... Claimants, especially those not represented by counsel, can hardly be expected to be familiar with the intricacies of the Secretary's Guidelines."). The court believes this failure was prejudicial to Johnson.

L.Ed.2d 698 (1987)). In *Polaski,* the Eighth Circuit held:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosages, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski,* 739 F.2d at 1322.

■ To conduct the proper *Polaski* analysis, "Merely quoting *Polaski* is not good enough, especially when an ALJ rejects a claimant's subjective complaints of pain." *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir. 1995). Instead, *"Polaski* requires that an ALJ give full consideration to all of the evidence presented relating to subjective complaints." *Ramey v. Shalala,* 26 F.3d 58, 59 (8th Cir.1994). To that end, "When making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir.1996) (citing Hall, 62 F.3d at 223). Such a finding is required to demonstrate the ALJ considered and evaluated all of the relevant evidence. *See Marciniak v. Shalala,* 49 F.3d

1350, 1354 (8th Cir.1995) (citing *Ricketts v. Secretary of Health and Human Servs.,* 902 F.2d 661, 664 (8th Cir.1990)). However, if "the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion," but "acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain .... An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case." *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996) (citing *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987)).

■ Without going into great detail, the court finds the ALJ adequately took into account four of the five factors in the *Polaski* test: (1) daily activities, (Tr. 166–67.); (2) duration, frequency and intensity of the pain, (Tr. 164–67.); (4) dosages, effectiveness and side effects of medication, (Tr. 166.); and (5) functional restrictions (Tr. 168–69.). The one factor the ALJ did not adequately address is (3) the precipitating and aggravating factors. As discussed above, the court is persuaded that, if Johnson worked for eight hours a day, five days a week, it would severely aggravate her arthritic condition. If the court had not already concluded that Johnson had proved by substantial evidence on the record as a whole that she was disabled prior to July 1, 1986, it might simply remand this case and ask the ALJ to consider the third *Polaski* factor. In this case, however, given the court's previous findings, remand is not appropriate.

### III. CONCLUSION

Based on the evidence in the record on a whole, the court is convinced the ALJ posed an improper hypothetical question to the vocational expert during the administrative hearing. Specifically, the ALJ erred in not including Johnson's manipulation and stamina limitations in his hypothetical. The court is persuaded that Johnson's limitations are supported by the evidence on the record as a whole, and especially by reports from Drs. Michet and Paulson. Had these limitations been included as they would have in a proper hypothetical, such a question would have

read very much like the second hypothetical posed at the administrative hearing. In response to the second hypothetical, the vocational expert testified that a person with the enumerated limitations could not perform work which exists in the national economy. The court also is persuaded that a proper hypothetical would have referred to Johnson's psychological problems. Because these problems were serious enough to produce panic attacks just a few months after her insured status ran, there is no doubt they also had a serious effect on her mental health while she was still insured. When considering the interaction between this psychological limitation and Johnson's numerous physical limitations, the court is further convinced that Johnson was incapable of performing work which existed in substantial numbers in the national economy at the time she still enjoyed her insured status.

The ALJ also erred by discounting Johnson's subjective complaints of pain before considering all five of the *Polaski* factors. Although the ALJ covered four of the five *Polaski* sufficiently, he specifically failed to consider the third *Polaski* factor—the precipitating and aggravating factors of Johnson's pain. The failure to consider this factor is closely related to the error the ALJ made in posing an improper hypothetical. On the other hand, the ALJ correctly discounted testimony from Dr. Josephson's answers to certain interrogatories which asked whether Johnson met the disability listings contained in §§ 1.02 and 1.03(A) of Appendix I to Subpart P of 20 C.F.R. Part 404 (1986) for active rheumatoid arthritis and other inflammatory arthritis, and arthritis of a major weight-bearing joint (due to any cause), respectively. Though the general rule in Social Security disability cases is that the testimony of a treating physician is to be given great weight, the interrogatory answers provided by Dr. Josephson in 1996 which indicate that Johnson met both disability listings in 1984 are so conspicuously at odds with the notes from his 1984 examination of Johnson, that the court cannot conclude there is evidence on the record as a whole to support a finding that Johnson met the above-mentioned disability listings prior to the termination of her insured status on June 30, 1986.

In this case, where the evidence on the record as a whole is clearly indicative of disability and additional hearings would serve no purpose other than to delay the inevitable receipt of benefits, remand is inappropriate and an immediate order granting benefits is justified. *See Andler*, 100 F.3d at 1394; *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir.1991) ("[W]here the total record convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate."). For these reasons, the court concludes there is substantial evidence on the record as a whole supporting a finding that Johnson is disabled and, therefore, entitled to benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et. seq.* Therefore, judgment shall be entered reversing the ALJ's decision.